IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JACQUELYN W. JACKSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CARLOS COSBY and JERRY | : | CIVIL ACTION NO. |
| BARNES, Deputy U.S. Marshals, as | : | 1:12 -CV-4447-AT |
| Individuals | : | |
| | : | |
| Defendants. | : | |

## ORDER

On August 4, 2012 at approximately 6 p.m., Plaintiff, Jacquelyn Jackson, a seventy-two year old woman who lives by herself, was unclothed and preparing for bed.  She was startled by a forceful banging on her front door.  When she asked who was there, a man responded that it was the U.S. Marshals and they would knock down her door unless she opened it.   Ms. Jackson hurried downstairs in her nightgown and opened the door and was met by approximately half a dozen armed members of the United States Marshal Service ("USMS").   A team of the Marshals rushed into the home without first obtaining Plaintiff's consent.  They then proceeded to conduct a warrantless search of her home while Plaintiff remained on the front porch, accompanied by Marshals Cosby and Barnes.  Plaintiff brings this *Bivens* action based on the events of that evening.[1]

---

[1] These facts are taken from Plaintiff's deposition testimony. Plaintiff's testimony is treated as true for purposes of review of Defendants' pending Motion for Summary Judgment.  *See Reeves*

Before the Court is Defendants' Motion for Summary Judgment [Doc. 49]. For the following reasons, Defendants' motion is **GRANTED IN PART AND DENIED IN PART.**

## I.   Legal Standard

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  The substantive law applicable to the case determines which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citations and punctuation omitted).   The court may not weigh conflicting evidence or make credibility determinations.  *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  It must support its motion with

---

*v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (when reviewing the record evidence at the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party").  When there is a conflict in the evidence, the nonmoving party's version of the of the evidence must be credited, even if the Court views the conflicting evidence as lopsided. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252-53, (11th Cir. 2013).

credible evidence that would entitle it to a directed verdict if not controverted at trial.  *Id.*  If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact.  *Id.*  When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim.  *Id.*  Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case.  *Id.*  The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial.  Fed. R. Civ. P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994).

## II.   Facts

The following facts are undisputed.  Around 6:00 pm on August 4, 2012, members of the U.S. Marshal Service ("USMS") were searching for Hajja Kenyatta Martin, a fugitive wanted for murder and other crimes.  (Defs. Reply Undisputed Facts, Doc. 52 ¶ 1; Pl. Dep., Doc 49-7 at 52.)[2]  Defendant Cosby was the lead agent on this assignment and in that capacity, led a team of at least seven Deputy and Special Deputy U.S. Marshals (the "USMS Team"), including Defendant Barnes.[3]  (Doc. 52 at ¶¶ 1, 3.)  The USMS Team had three valid arrest

---

[2] The Court's citations correspond to the page numbers assigned by the Court's CM/ECF system.
[3] Other members of the USMS Team included Deputy U.S. Marshal Clay Cleveland, Deputy U.S. Marshal Donald Ruston Hathaway and members of the Southeast Regional Fugitive Task Force ("SERFTF"), including Special Deputy U.S. Marshal Jerry Barnes, Special Deputy U.S. Marshal

warrants for the fugitive but was uncertain of his current whereabouts.  (*Id.* ¶¶ 3-4.)

Marshal Cosby knew that Martin no longer resided at 655 Shore Drive. However, he determined that it was necessary to search the home at this address –i.e., Plaintiff's home – because the address was associated with one of Martin's friends from California and because fugitives often return to addresses where they have previously lived.  (*Id.* ¶¶ 3-6.)  Ms. Jackson had lived in the home since December 2011, approximately eight months at that time.  (Doc. 49-7 at 9.)

Before arriving at Plaintiff's home, Mr. Cosby advised his team members that 655 Shore Drive was a "third party" home, meaning it was not the fugitive's current residence.  (Doc. 52 ¶ 7.)  The USMS Team had neither applied for nor received a search warrant for Plaintiff's home.  (Defs'. Resp. Pl's. Facts, Doc. 54 ¶ 1.)   Defendants and their team understood that there were no exigent circumstances present that would authorize entry to the residence.  (*Id.* ¶ 2; Cosby Dep., Doc. 49-2 at 14.)   Thus, Mr. Cosby instructed the Team that they were required to obtain consent to enter and search the house for the fugitive. (Doc. 52 ¶ 7.)  It was Mr. Cosby's job as lead agent to obtain consent from Plaintiff.  (*Id.* ¶ 8.)  Indeed, the lead agent is viewed as "solely responsible for getting consent to search."  (Decl. of Clay Cleveland, Doc. 49-6 ¶ 9; Decl. of Steve Davis, Doc. 49-3 ¶ 10.)  The other agents rely on the lead agent to obtain consent and direct Team members to proceed once consent is obtained.  (Doc. 49-6 ¶¶ 9-

Steve Davis, Special Deputy U.S. Marshal Jason Dorsey, and Special Deputy U.S. Marshal James Parker.  (Doc. 52 ¶ 1.)

4

10; Doc. 49-3 ¶¶ 9-10, 16-17, 20.)  As a general practice, the other agents do not enter a third party home without either a directive from the lead agent or independently hearing the third party consent.  (Doc. 49-6 ¶¶ 14-16; Doc. 49-3 ¶¶ 18-20.)

The USMS Team approached Plaintiff's house in a protective line formation called a "stack."  (Doc. 52 ¶ 12.) The first person in the stack was carrying a protective shield with the other Team members lined up behind him. (*Id.*)  The Team moved from the street to Plaintiff's door in this formation. (Cosby Interrog. Resp., Doc. 51-5 at 14.)  Once at the door, Mr. Cosby stepped out of the stack and stood next to the Deputy Marshal holding the shield.  (*Id.*)  Mr. Cosby knocked on the door and announced the presence of the law enforcement officers.  (Doc. 52 ¶ 20.)  The USMS Team, including Mr. Cosby, had their guns drawn as Plaintiff answered the door.  (*Id.* ¶ 21; Doc. 49-2 at 36-37.)

The parties dispute what happened next.  According to Defendants, Mr. Cosby asked for and received Plaintiff's consent to search her home for the fugitive. (Doc. 49-2 at 14-15.)  Mr. Cosby testified that when Plaintiff came to the door he asked her to step out onto the porch.  (*Id.* at 9, 15.)  Mr. Cosby and Mr. Barnes holstered their guns once Plaintiff came outside.  (*Id.* at 37.)  Mr. Cosby then asked her who else was in the house and Plaintiff replied that she was home alone.  (*Id.* at 9.)  Mr. Cosby asked her if the Marshals could search her home. (*Id.*)  Mr. Cosby claims that Plaintiff verbally consented to the search.  (*Id.*)  At this point, Mr. Cosby directed the stack to enter Plaintiff's house and search for

the fugitive.[4]   (*Id.*)   While Mr. Cosby and Mr. Barnes claim that Plaintiff consented to the search, no other member of the USMS Team has an independent recollection of Plaintiff's consent.  (*Id.*; Barnes Interrog. Resp., Doc. 51-6 at 13; Doc. 49-6 ¶¶ 11-13; Doc. 49-3 ¶¶ 14-17; Decl. of Donald Hathaway, Doc. 49-5 ¶¶ 10-12.)

Plaintiff contests this version of events.  According to Plaintiff, she was undressed and in her bedroom upstairs when the officers initially banged on her front door.  (Doc. 49-7 at 52.)  When she told the officers she was undressed, they replied that they would break in the door unless Plaintiff opened it.   (*Id.*)  Plaintiff hurried to put on a nightgown and a buttoned shirt before answering the door.   (*Id.* at 52-54, 72-73.)   About three U.S. Marshals entered her home immediately after she opened the door.  (Pl. Dep., Doc 49-7 at 61-63.)  Nobody asked if she consented to the search, and the three officers entered her home before she had a chance to say anything.  (*Id.* at 66-67.)   The three officers proceeded to search Plaintiff's house for the fugitive.

Once the officers entered her house, Plaintiff moved onto her porch and was accompanied by Mr. Cosby and Mr. Barnes, who had holstered their weapons.[5]  (*Id.* at 57-59, 67-68; Doc. 52 ¶¶ 31, 33.)  Mr. Cosby spoke to Plaintiff

---

[4]  Defendant Cosby testified that he "told the stack to go in," while one member of the stack testified that Mr. Cosby "signaled that he had obtained consent." (See Doc. 49-2 at 9; Doc. 49-3 ¶ 16.)

[5]  Plaintiff does not recall whether Mr. Cosby asked Plaintiff to step onto the porch, or if Mr. Cosby pulled her outside.  (Doc. 49-7 at 57-59.)

during the search and asked if there was anybody else in the house.[6]  (Doc 49-7 at 59-61.)  Plaintiff replied that she was alone, and she asked who the USMS Team was and what they were looking for.  (*Id.*)  Plaintiff and Mr. Cosby continued to talk during the search of her home.   (*Id.* at 68-69.)   Mr. Cosby did not immediately say who they were looking for, but he did tell Plaintiff that they were looking for a murderer.  (*Id.* at 68-69, 77.)  Mr. Cosby did not ask for permission to search Plaintiff's home at any time.  (*Id.* at 60-61.)

The search took approximately 10 to 20 minutes.[7]  (*Id.* at 68-69, 102; Doc. 51-5 at 15.)   During this time, Plaintiff felt like she "was being held hostage." (Doc. 49-7 at 69.)   Defendant Cosby is 6'3" and weighs 280 pounds, while Defendant Barnes is 6'1" and 270 pounds.   (Doc. 49-2 at 11; Doc. 51-6 at 4.) Plaintiff stood on the porch facing the door while leaning her shoulder on the house.  (Doc. 49-7 at 99-101.)  Defendant Cosby stood next to her facing the same direction.  (*Id.* at 99-100.)  At times, she turned around to look at the street.  (*Id.* at 100-102.)  During her conversation with Defendant Cosby, she stated that her heart was racing and she was having palpitations.  (*Id.* at 69.)  She was also visibly shaking.  (*Id.* at 81.)  Mr. Cosby admits Plaintiff appeared "mad" that her home was being searched.  (Doc. 54 ¶ 12.)

The parties are largely in agreement over the rest of the evening's events. The three officers exited Plaintiff's house after they determined that the fugitive

---

[6] Plaintiff does not recall speaking with Mr. Barnes individually though she recalled another officer's presence on the porch besides Mr. Cosby.  (Doc. 52 ¶ 38; Doc. 49-7 at 81.)
[7] Plaintiff is uncertain how long the search lasted, speculating that it may have lasted between ten and twenty minutes.  (Doc. 49-7 at 69, 102.)

was not inside.  (Doc. 49-7 at 81-82.)  Once the officers finished their search, Mr. Cosby and Mr. Barnes asked Plaintiff if she wanted to go inside and sit down.[8] (*Id.*; Cosby Interrog. Resp., Doc. 51-5 at 15.)  Mr. Cosby and Mr. Barnes went inside the house with Plaintiff and asked if she wanted them to call an ambulance.  (Doc. 49-7 at 82-88; Doc. 49-2 at 10.)  Plaintiff declined to call an ambulance but tried to call her son.  (*Id.*)  Plaintiff was upset and had trouble reaching her family members.  (*Id.*)  When Plaintiff finally reached her daughter-in law, she found she was so shaken that she could not talk and describe what had happened.  (*Id.*)  Mr. Cosby assisted Plaintiff and spoke to her daughter-in-law, explaining what had transpired.  (*Id.*)

Mr. Cosby and Mr. Barnes waited with Plaintiff until her son and daughter-in-law arrived.  (*Id.*)  Plaintiff was able to calm down while they waited for her family but she never asked Mr. Cosby or Mr. Barnes to leave her house.  (Doc. 49-7 at 90-91.)  Once Plaintiff's son arrived, Mr. Cosby explained who they were searching for and why they searched Plaintiff's home.  (*Id.* at 93.)  After Mr. Cosby and Mr. Barnes confirmed that Plaintiff did not need medical attention, the two officers left to continue searching for the fugitive.  (Doc. 51-5 at 16.) Before they left, Mr. Cosby gave Plaintiff his business card.  (Doc. 52 ¶ 42.)

---

[8] At the time of her deposition, Plaintiff asserted that only Mr. Cosby entered the home with Plaintiff, and not Mr. Barnes.  (Doc. 49-7 at 81-82.)  However, Defendants admit that both Mr. Cosby and Mr. Barnes entered the home with Plaintiff after the search.  (Doc. 51-5 at 15; Barnes Interrog. Resp., Doc. 51-6 at 14.)

There is no dispute that Mr. Cosby's conversation with Plaintiff was professional, and that Mr. Cosby was clear and forthright with Plaintiff. (*Id.* ¶¶ 37, 42.) Furthermore, it is undisputed that:

> Marshals Cosby and Barnes never told Plaintiff that she was under arrest, never told her that she was being detained, never handcuffed her, never threatened her, never touched her, never took her keys or any of her belongings, never told her they were going to take her to the station or anywhere, never told her that she could not go back into the house, and never told her that she had to stand outside with them.

(Doc. 52 ¶ 34.)

Plaintiff has experienced palpitations and anxiety in the period since August 4, 2012. (Doc. 49-7 at 117.) She reported sometimes feeling an increased heart rate when thinking about actions of the USMS Team. (*Id.* at 119.) Plaintiff sought medical treatment for these symptoms and was prescribed medication to treat her anxiety. (*Id.* at 117-120.)

## III. Discussion

Plaintiff's Amended Complaint alleges Fourth Amendment violations against Defendants Cosby and Barnes based on the search of her house and the alleged unlawful seizure of her person. (Doc. 26.) Plaintiff's search claim can be further reduced into two parts: (1) Defendant Cosby's liability either as a supervisor or alternatively, as a lead member of the USMS Team for the initial warrantless search of Plaintiff's home by the USMS Team, and (2) Defendants' entry into the house with Plaintiff after the search for the fugitive had concluded. Defendants argue that they are entitled to qualified immunity for all of Plaintiff's

claims.  The Court proceeds by first analyzing Plaintiff's claim against Defendant Cosby for the initial USMS search, then Plaintiff's seizure claim against both Defendants, and finally Plaintiff's search claim against both Defendants for entering her home.

"The purpose of qualified immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)) (internal quotation marks omitted).  Qualified immunity functions as "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The Supreme Court has therefore "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).  Officials seeking qualified immunity must first establish that they were acting within their discretionary authority when the alleged constitutional violation occurred.  *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).  If so, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate.  *Id.*; *McClish*, 483 F.3d at 1237.

A plaintiff must make two showings when challenging qualified immunity. First, a plaintiff must show that a defendant's conduct violated a constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The Court must review

the facts in connection with the alleged violation in the light most favorable to Plaintiff. *McClish*, 483 F.3d at 1237.  Second, a plaintiff must show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

At the outset, the Court notes that there is no evident dispute over whether Defendants were acting within their discretionary authority.  "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).  The Court is satisfied that Defendants were clearly acting in their discretionary authority during the relevant events of August 4, 2012.  Thus, the Court turns to Plaintiff's claims against Defendants.

## A.    Defendant's Cosby's Initiation of the USMS Search

The Court first examines whether Defendant Cosby's conduct violated a constitutional right.  Plaintiff alleges that "Defendant Cosby, as supervisor on the scene, failed to obtain the requisite search warrant to enter Plaintiff's home and instructed his subordinates to enter with or without Plaintiff's consent."  (Doc. 26 ¶ 28.)  Even though it is undisputed that Defendant Cosby did not enter Plaintiff's

home during the USMS search, Plaintiff argues that Defendant Cosby's personal conduct in directing the USMS team to proceed with the search caused Plaintiff to suffer a constitutional deprivation.  In turn, Defendants argue that Defendant Cosby is not liable as a supervisor in the *Bivens* context[9], and that even if he were, he is entitled to qualified immunity.

Plaintiff's Fourth Amendment rights are directly implicated by the USMS Team's entry and search of her home. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511, (1961)). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 585, (1980)); *Bashir v. Rockdale County, Ga.* 445 F.3d 1323, 1330 (11th Cir. 2006) (holding that deputies' entry into the Plaintiff's home without a warrant, exigent circumstances, or consent clearly violated established Fourth Amendment law.)

---

[9] A *Bivens* action is the "federal analog" of an action against a state official for the deprivation of constitutional rights pursuant to 42 U.S.C. § 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).

Defendants do not dispute that the USMS Team conducted a warrantless search of Plaintiff's home in the absence of exigent circumstances. Furthermore, Plaintiff testified unequivocally in her deposition that she never consented to the initial search of her home for the fugitive. The Court rejects Defendants' characterization of Plaintiff's insistence that no consent was obtained or given for the initial entry as logically "impossible" or constituting a mere "scintilla" of evidence. (Def. Mot., Doc. 49 at 10.) First, Defendants' challenge to Plaintiff's recollection of events presents a credibility issue that is not properly before the Court on a motion for summary judgment. Second, the Court disagrees with Defendants' assertion that Plaintiff's testimony describing how "the stack" immediately entered her home without knocking her over is logically flawed. The USMS shield held by the first officer entering is two feet wide and the officers could have easily entered Plaintiff's home shortly after she opened her inward-facing door without necessarily physically overrunning her.[10] Plaintiff only had to stand aside and out of the way when they entered – which would be a natural response for a 72 year old woman if a team of law enforcement officers entered through the front doorway. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 914 (11th Cir. 1993) (holding that district court must refrain on a summary judgment motion from resolving conflicting evidence on material facts or reaching credibility determinations); *Feliciano*, 707 F.3d at 1253 (holding that Plaintiff's sworn statement, recounting her first-hand personal knowledge and

---

[10] The shield used by the USMS Team is 24 inches by 36 inches and weighs 18 pounds.  (Doc. 52 ¶ 13.)

observation of police officers' entry into the apartment, "presents a classic swearing match, which is the stuff of which jury trials are made", even if the sworn statement is self-serving.)

Thus, the USMS Team's initial entry and search of the house represents a *per se* Fourth Amendment violation, if indeed their entry was made without consent. However, the Court must address whether Defendant Cosby may be held liable for this violation even though he did not personally enter Plaintiff's home with the USMS Team to conduct the search himself.

Plaintiff argues that Defendant Cosby is liable as a supervisor of the USMS Team. "It is well established in this circuit that supervisory officials are not liable under [*Bivens*] for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (quotations omitted). "Instead, supervisory liability under [*Bivens*] occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citing *Gonzalez*, 325 F.3d at 1234).

Defendants challenge this theory of liability, claiming that Defendant Cosby was not a supervisor in the context of a § 1983 or *Bivens* action. While Defendant Cosby was the lead agent of the USMS Team, Defendants argue that this role is distinguishable from that of a supervisor. To this end, Defendants

14

point to evidence that Cosby did not exercise supervisory personnel authority over any member of the USMS Team.[11]

However, it is not necessary for the Court to determine whether Defendant Cosby was acting in a supervisory capacity with associated employment management authority.  Instead, the Court proceeds based on the recognition that "vicarious liability is inapplicable to *Bivens* and § 1983 suits," and that the relevant inquiry is whether Defendant Cosby's individual actions violated the Constitution.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, *or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).  Here, Defendant Cosby's personal role in the USMS Team's search is causally linked to the constitutional violation.  *See Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005) ("A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."); *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 999 (11th Cir. 1995); *see also Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).

---

[11] Specifically, Defendant Cosby had no authority to take tangible employment action over anyone, including the USMS Team.  (Brady Decl., Doc. 49-4 ¶ 5.)  Examples of such tangible employment actions include the ability to hire, fire, promote, demote, reassign, or adjust benefits.  (*Id.*)

Plaintiff argues that Defendant Cosby's "conduct, his giving the signal to his team to enter even though he had no consent, his participation in the venture," and his failure to obtain a search warrant caused the constitutional violation. (Pl's. Resp., Doc. 51 at 10.)  As the lead agent, it was Defendant Cosby's express responsibility to request and obtain Plaintiff's consent for the search of her home.  Defendant Cosby testified unambiguously that he received consent and instructed the USMS Team that they could search Plaintiff's house for the fugitive.  All evidence in the record indicates that that USMS Team commenced their search of Plaintiff's home only after Defendant Cosby indicated to them that he had obtained Plaintiff's consent.

In direct contrast, Plaintiff testified that Defendant Cosby never asked for her consent before the USMS team entered her home and she never consented to the search.  Defendants argue that this testimony is not sufficient to defeat summary judgment because it falls short of establishing that Defendant Cosby directed the USMS Team to search her house without her consent.  (Doc. 49 at 18.)  However, the evidence indicates that the established USMS protocol was for the lead agent to obtain the third party's consent and that here, all the team members indeed relied exclusively upon Cosby's signaling or advising them that he had obtained such consent as a precondition to their entering into Plaintiff's home.

Drawing "all reasonable inferences in favor of the party opposing summary judgment," the Court finds that a disputed material issue of fact exists as to

whether Cosby individually in fact caused the home entry and search by failing to obtain Plaintiff's consent. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (quotation omitted).  A reasonable jury could infer that Defendant Cosby initiated the USMS search without actually obtaining Plaintiff's consent, whether because he assumed he could quickly obtain it later or for any other reason.[12]  A reasonable jury could further conclude based on all the testimony of the team members that Defendant Cosby's direction to the USMS Team was in turn the direct cause and trigger of Plaintiff's Fourth Amendment constitutional deprivation.

The Eleventh Circuit reached the same conclusion in a case with similar facts.  *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 999 (11th Cir. 1995).  In *Swint*, a sheriff moved for summary judgment on § 1983 claims related to his authorization of two police raids.  *Id.*  The sheriff argued he was entitled to qualified immunity because he "was not personally involved in conducting the raids."  *Id.*  The court rejected this argument, noting "it is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation."  *Id.* (quotation omitted); *see also Gonzalez*, 325 F.3d at 1234 (quotation omitted).

---

[12]  The Court is not presented here with an evidentiary dispute regarding whether Defendant Cosby reasonably misconstrued Plaintiff's communication or whether a reasonable officer under the circumstances could have interpreted Plaintiff as consenting to the search.

The causal connection here is much less attenuated than what the court faced in *Swint*. Thus, it is clear that the evidence in this case would not preclude a reasonable jury from finding that Defendant Cosby caused the constitutional violation at issue. The Court must next consider whether the constitutional right at issue here was "clearly established" at the time of the misconduct given the specific factual circumstances of this case. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If so, Defendant Cosby is not entitled to qualified immunity. *Id.*

The Court concludes that Plaintiff's Fourth Amendment right to be free from warrantless searches of her home without consent was clearly established at the time of the search based on specifically applicable case law as well as established general constitutional legal principles. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." (quotations omitted)); *see also Jardines*, 133 S. Ct. at 1414 ("when it comes to the Fourth Amendment, the home is first among equals"). Indeed, Defendant Cosby expressly recognized that Plaintiff's consent to the search of her home was a constitutional requirement. (Doc. 49-2 at 14.) There is no legitimate question of whether Defendant Cosby had fair warning that his directing the USMS Team to search Plaintiff's home, if Plaintiff's consent was not secured, would result in the team's entry into her home and thus, a violation of Plaintiff's Fourth Amendment Constitutional rights.

18

The parties submit fundamentally opposing accounts of the events leading to the USMS Team's search – but these opposing accounts do not actually relate to Marshall Cosby's undisputed role in instructing the team to proceed with entry into Plaintiff's home or of the fundamental Fourth Amendment requirements applicable here. Accordingly, should the jury determine that Marshal Cosby instructed the USMS team to enter the Plaintiff's home without obtaining her consent, Cosby would not be entitled to qualified immunity for his role in the initial USMS search of Plaintiff's home.[13]

### B.    Defendants' Seizure of Plaintiff

Plaintiff alleges that Defendants Cosby and Barnes effected a Fourth Amendment seizure of Plaintiff by ordering her out of her home and keeping her on her porch while the USMS Team conducted their search.  Defendants argue they are entitled to qualified immunity on this claim and accordingly seek summary judgment.   The Court begins its qualified immunity analysis by examining whether Defendants' actions rise to the level of a Fourth Amendment violation.

A person is seized under the Fourth Amendment if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  "A police officer may make a seizure by a show of authority and

---

[13]  The dispositive inquiry here remains whether there is a sufficient causal connection between Defendant Cosby's actions and the alleged constitutional violation.  *See Gonzalez*, 325 F.3d at 1234 (quotation omitted).

without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007). Where a person "has no desire to leave for reasons unrelated to the police presence," courts examine whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 255 (quotation omitted).

When evaluating whether an interaction rises to the level of a Fourth Amendment seizure, courts may consider circumstances such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (quoting *Mendenhall*, 446 U.S. at 554). The Eleventh Circuit has articulated several additional relevant factors, including "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (quoting *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006)). Courts are limited to an objective consideration of these factors and must not introduce

subjective beliefs into this analysis.  *Brendlin*, 551 U.S. at 260; *see also Miller*, 458 F.3d at 1258 n.4.

Plaintiff testified in her deposition that she was not sure if Defendant Cosby pulled her out onto the porch from her home or if she walked onto her porch after Cosby asked her to step outside.  (Doc. 49-7 at 58-59.)   It is undisputed that Defendants did not have their guns out while they spoke with Plaintiff on the porch.  It is further undisputed that Defendants Cosby and Barnes did not tell Plaintiff she was being detained or arrested, or that she had to remain on the porch with them.  Defendants did not touch Plaintiff.  Plaintiff and Defendants remained standing on the porch for the approximately 10 to 20 minutes of the USMS Team's search of her home.

During that time Plaintiff had a conversation with Defendant Cosby about several subjects, including Defendant Cosby's mother among others.  When Ms. Jackson inquired regarding what the Marshals were looking for, Mr. Cosby replied, "what make[s] you think I'm not looking for you?" (Doc. 49-7 at 76-77.) However, Defendants did not tell Ms. Jackson who they were looking for until much later, according to Plaintiff's testimony.  (*Id.* at 70.)   Except for Cosby's remark above and the initial confrontational dialogue that occurred when the Marshals banged on Plaintiff's door, Defendant Cosby was not aggressive in his treatment of or conversation with Plaintiff.   Defendants did not threaten Ms. Jackson at any time while she was standing on the porch.   At no point did Plaintiff ask Defendants to leave her property.  Nor did Defendants tell Plaintiff

she could not return into her home or alternatively, not stay at her home.   (*Id.* at 72.)

Still, there are several factors that suggest this encounter had a coercive nature.   Plaintiff was a 72 year-old woman who graduated from high school and had some vocational school training.   She rushed to answer the banging on her door, wearing only a nightgown and a shirt. She did not get a chance to find a robe or get dressed before joining Defendants on the porch.   Defendant Cosby is 6'3" and 280 pounds; Defendant Barnes is 6'1" and 270 pounds.[14]   The parties were oriented such that, at times, Defendant Cosby stood shoulder to shoulder next to Plaintiff, as she was leaning on a wall with her other shoulder.

During the alleged seizure, the USMS Team was searching her home while an unknown number of additional officers remained on the street.   While the language and tone of the conversation between Plaintiff and Defendant Cosby was generally professional and respectful, Ms. Jackson might reasonably have interpreted the overall interaction as menacing or intimidating.   At some point, Plaintiff told Defendants that she was anxious and was experiencing heart palpitations.   Plaintiff also states she was visibly shaking.   Plaintiff testified: "I just felt like I was being held hostage because I was palpitating.   And I told him I'm palpitating and it didn't seem to phase (*sic*) him."   (Doc. 49-7 at 69.) Defendants do not appear to have substantively responded until the conclusion of

---

[14] The Court finds the stature of the officers relevant, as the physical disparity between Defendants and Plaintiff has bearing as to the "threatening presence" of the officers.  See *Kaupp*, 538 U.S. at 630.

the search, at which time they asked her if she wanted to go inside her home and sit down.   Ultimately, Plaintiff testifies that she was seized because she was "made to come outside on the porch improperly dressed."  (Doc. 49-7 at 80.)

While the Court well understands Plaintiff's viewpoint, the objective factors on balance here do not evince a Fourth Amendment seizure.  Ms. Jackson was not in actuality detained.  Her movement was not restricted as a result of the officers' directives or force.  While Defendant Cosby appears to have been very close to Plaintiff on the porch at times, the record does not suggest that Defendants directly or indirectly impeded Plaintiff's movement.  They were not standing between her and her house, nor were they preventing her from moving from the porch to the yard.  Plaintiff appears to have voluntarily interacted with the officers during the encounter.

This encounter, while intimidating to Plaintiff under the circumstances, does not bear the full earmarks of a seizure for Fourth Amendment purposes. Plaintiff has not provided sufficient record evidence to support a finding that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Mendenhall*, 446 U.S. at 554; *Miller*, 458 F.3d 1257. First, the alleged detainment occurred on the porch of the house, rather than in the house itself.  *McClish*, 483 F.3d at 1241-1248 (discussing firm line in the case law that distinguishes the zone of constitutional privacy within the home versus the porch).  Further, in the absence of evidence of

Defendants' direct restriction of Plaintiff's movement, physical touching[15], coercive communications, or display of weapons, Plaintiff cannot establish a seizure for Fourth Amendment purposes in connection with her "confinement" on the porch. Likewise, Defendants' conduct was not "clearly unlawful in light of pre-existing law." *McClish*, 483 F.3d at 1248. Defendants Cosby and Barnes are therefore entitled to qualified immunity in connection with this specific aspect of Plaintiff's claims.

### C.   Defendants' Entry into Plaintiff's House

Lastly, Plaintiff argues that Defendants' entry into Plaintiff's home once the USMS Team had concluded its search also constitutes a Fourth Amendment violation. Plaintiff argues that Defendants' entry into the house presents the same issues as the USMS Team's earlier search, namely that it was a warrantless search absent exigent circumstances and without consent. Defendants argue they are entitled to qualified immunity on this claim.

Defendants argue that their entry into the home was done with Plaintiff's consent at this later juncture. Plaintiff testified that once the USMS Team's search was finished, Defendants asked her if she wanted to go inside and sit down. She did as she felt heart palpitations, and the two Defendant officers

---

[15] While Plaintiff thought that Officer Cosby might have yanked her out of the house, she was not sure of this. The Court therefore cannot credit her testimony as clear, affirmative evidence of the use of force for purposes of establishing a seizure.

followed her inside.[16]   Plaintiff admits that Defendant Cosby was "concerned about [her] anxiety and [her] health," and that he offered to call for an ambulance.  (Doc. 49-7 at 81-82, 88-89.)  Defendant Cosby then helped Plaintiff call her family members.

Defendants waited with Plaintiff while her relatives came.  This took roughly ten minutes, during which time the conversation between the parties ranged from programming numbers into the telephone to various television shows.  Plaintiff's anxiety had subsided significantly by the time Plaintiff's son arrived.  (*Id.* at 94-95.)  Defendants exited the house shortly thereafter.  At no point did Plaintiff ask Defendants to leave her house.  (*Id.* at 91.)

These circumstances are not strongly indicative of a Fourth Amendment violation.  While it is undisputed that Defendants entered Plaintiff's house, the record makes plain that Defendants offered and provided assistance to Plaintiff while she was in distress.  Furthermore, the record indicates that Defendants may have concluded that Plaintiff effectively consented to their entry into the house with her from the porch.  Defendants suggested that Plaintiff sit down inside after hearing she was not feeling well.  When she agreed, the officers accompanied her to her living room.  Plaintiff did not ask them to leave, even as her anxiety lessened.

---

[16] Plaintiff's testimony suggests that only Defendant Cosby entered the house, while Defendant Barnes remained on the porch.  However, Defendants admit that they both accompanied Plaintiff into her home.

To be sure, Plaintiff's non-objection to Defendants' entry does not establish Plaintiff's affirmative consent.  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990) ("[T]he government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. This will not do.")); *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1329 (rejecting officer's contention that implied consent for entry into the Plaintiff's home can be implied because Plaintiff purportedly spoke to the officer as he followed Plaintiff into the house, although the officer never asked for permission to enter); *McClish*, 483 F.3d at 1241 (re-affirming the principle that "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction *entry* into the home based upon inferred consent." (citation omitted)).  Additionally, Plaintiff's non-objection may conceivably be attributed to a "show of official authority," as the USMS Team has just concluded the search of her house.  *Id.* at 751 (stating that consent to search is invalid where it represents "an acquiescence to a show of official authority." (quotation omitted)).  Given the particular circumstances raised here and judicial reluctance to apply implied consent exceptions, the Court turns to whether Ms. Jackson's communication to the Defendants regarding her heart palpitations and distress may further alter the Fourth Amendment analysis here.[17]

---

[17]  Even if the Court were to find that the Marshals lawfully entered Plaintiff's home when they first conducted their search, the Court would have to evaluate the lawfulness of the Defendants'

While the government's warrantless intrusion into a home is presumptively unreasonable, "that presumption can be overcome." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).  Under the "emergency aid" warrant exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).   This exception requires "an objectively reasonable basis for believing" that a person in the house is threatened with serious injury or in need of immediate aid.  *Fisher*, 558 U.S. at 47 (quoting *Brigham City,* 547 U.S. at 406).

Here, Defendants were clearly presented with objective indicia that Plaintiff was in distress and suffering palpitations.  Plaintiff testified that she was visibly shaking and complained of heart palpitations.   Defendants were not unreasonable in concluding that these symptoms, exhibited by an elderly woman, suggested that Plaintiff might be at risk of serious harm.  Defendants responded by following Plaintiff inside her home to temporarily accompany and assist her. They left once they learned she did not require medical attention and upon her son's arrival.  The circumstances here may not precisely fit the classic "emergency aid paradigm," as the Defendants could have arguably assisted Plaintiff and assured her safety without re-entry into her home.   However, the Court must conclude that a reasonable officer might not have known he would violate clearly established constitutional norms by providing support to Plaintiff in her home for

---

entry into the home with Ms. Jackson after the conclusion of the search.  *Bashir*, 445 F.3d at 1330.

a short duration of time immediately after she indicated she was suffering heart palpitations due to the fright or trauma of the preceding search. Under these particular circumstances, Defendants are entitled to qualified immunity for claims based on their physical entry into Plaintiff's house after the USMS Team's search of her home.

## IV.    Conclusion

Accordingly, Defendants' Motion for Summary Judgment [Doc. 49] is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff's Fourth Amendment claim against Defendant Cosby in connection with his causal role and participation in the initial USMS Team's search of her home **SHALL PROCEED**.  Plaintiff's other claims against Defendant Cosby are **DISMISSED**. Plaintiff's claims against Defendant Barnes are **DISMISSED**.

The Court refers this case to the next available Magistrate Judge on rotation for mediation.  The mediation **SHALL BE CONCLUDED** within fifty days of this Order.   In the event no settlement is reached, the parties are **DIRECTED** to submit a proposed consolidated pretrial order within 20 days of the conclusion of the mediation.

**IT IS SO ORDERED** this 5th day of September, 2014.

_____
**Amy Totenberg**
**United States District Judge**

28